## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| **BILL PRYOR, individually and on behalf of all others similarly situated,**<br><br>**Plaintiff**<br><br>v.<br><br>**IDEAL CREDIT UNION,**<br><br>**Defendant** | Case No.:<br><br><br>**COMPLAINT AND JURY TRIAL DEMAND** |

## CLASS ACTION COMPLAINT

COMES NOW, Plaintiff Bill Pryor ("Plaintiff"), by and through Plaintiff's counsel, and brings this Class Action Complaint against Ideal Credit Union (hereinafter "Defendant" or "Ideal Credit Union") individually and on behalf of all others similarly situated, alleging, upon personal knowledge as to Plaintiff's individual actions and upon information and belief and/or counsel's investigations as to all other matters, the following:

### INTRODUCTION

1.    This is a class action brought by Plaintiff to assert claims, individually and on behalf of all others similarly situated, against Defendant Ideal Credit Union (hereinafter "Defendant" or "Ideal Credit Union").  Plaintiff's claims arise from Defendant's assessment and collection of improper and excessive overdraft fees and fall into the following categories, among others: (1) assessing overdraft fees on ATM and one-time debit transactions in violation of Regulation E ("Reg E"), 12 C.F.R. § 205.17, under the Electronic Funds Transfer Act ("EFTA"); (2) making untrue, deceptive, and/or misleading statements in connection with the advertisement of the Overdraft program; (3) engaging in fraud, false pretense, false promise, misrepresentation,

misleading statements, and/or deceptive practice, with the intent that others rely thereon in connection with the sale of the Program; (3) engaging in deceptive trade practices by representing that the Program has benefits that it does not have; (5) advertising services with intent not to sell them as advertised; (6) engaging in conduct which similarly creates a likelihood of confusion or of misunderstanding; and (7) making negligent representations in connection with the sale of the Overdraft program.

## JURISDICTION AND VENUE

2.    This Court has original jurisdiction of this action under 28 U.S.C. §§ 1331 and 1337 because the claims arise under the laws of the United States, including EFTA, 15 U.S.C. §§ 1693, *et seq.* and 12 U.S.C. §§ 85-86.

3.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because (a) Defendant is subject to personal jurisdiction here; (b) regularly conducts substantial business in this district; and/or (c) a substantial part of the events or omissions giving rise to the claims asserted herein occurred and continue to occur in this district.

## PARTIES

A.    **PLAINTIFF**

4.    Plaintiff Bill Pryor ("Plaintiff") is a resident and citizen of Washington County, in the State of Minnesota and is a customer of Defendant Ideal Credit Union.  At all relevant times, Plaintiff has been an Ideal Credit Union account holder.

5.    Defendant's wrongful overdraft policies and practices described herein have each caused harm to Plaintiff and the members of the Class Plaintiff seeks to represent.

**B.     DEFENDANT**

6.     Defendant Ideal Credit Union, a Minnesota state-chartered Credit Union, has six (6) locations – Eagan, Hugo, Inver Grove Heights, North St. Paul, Stillwater, and Woodbury. Defendant Ideal Credit Union's main office is located at 8499 Tamarack Road in Woodbury, Minnesota 55125-9201.

7.     In connection with Plaintiff's account, Ideal Credit Union issued a debit card to Plaintiff.  The card allows customers to access their checking account funds by using the card to execute a transaction.  The charge is processed electronically, and Ideal Credit Union will accept or decline the transaction at the point of sale.

8.     Ideal Credit Union is required to comply with Regulation E in all aspects before it can assess overdraft fees on ATM and non-recurring debit card transactions that overdraw a person's account.  However, Ideal Credit Union assessed Plaintiff overdraft fees without doing so.  As a result, Plaintiff was harmed and incurred improper overdraft fees.

9.     Additionally, Ideal Credit Union's marketing and advertising of its Overdraft Program were unfair, deceptive, and/or unlawful in that the marketing and advertisements were inconsistent with the program itself.  At all relevant times, Defendant's misrepresentations and/or omissions are material and likely to mislead customers and did mislead them.   The overall net impression created by the representations and omissions is that the program protects you from going into Overdraft – not cause you to go into overdraft and stay there.

10.     Defendant wrongfully charged Plaintiff multiple overdraft fees.  Defendant failed to notify Plaintiff that Plaintiff could incur overdraft fees on debit card or ATM transactions even though there were sufficient funds in the checking account to cover the transaction at the time the transaction was executed.  Defendant never notified Plaintiff, at the time Plaintiff executed the

purported insufficient funds transactions that Plaintiff's checking account was or would be overdrawn or that Plaintiff would be charged an overdraft fee as a result of the transactions. Defendant paid, rather than returned, all debit card charges described above, even though Plaintiff's accounts purportedly lacked sufficient funds to cover the transactions.

11. Defendant failed to comply with Regulation E and the other EFTA requirements that must be met for Defendant to assess overdraft fees on ATM and one-time debit card transactions, yet still charged Plaintiff and members of the proposed Class overdraft fees for ATM and one-time debit card transactions.

12. Based on information and belief, the overdraft charges incurred by Plaintiff is representative of millions of dollars of overdraft fees that Defendant wrongfully assessed and deducted from its customers' accounts. These wrongful takings are especially egregious considering the fact that Defendant approved each transaction and knew at the time of approval whether there were sufficient funds in the account to cover the transaction. Plaintiff was charged and paid overdrafts fees as a result of Defendant's unfair, unlawful, and/or deceptive business practices described herein.

13. Defendant's wrongful overdraft policies and practices described herein are illustrative of the harm caused to Plaintiff and members of the Class.

14. Should Plaintiff discover the identities and capacities of additional parties that are liable under the claims set forth herein, Plaintiff will seek leave of Court to amend this Complaint to add these parties as additional Defendants.

## COMMON FACTUAL ALLEGATIONS

### A.    IDEAL CREDIT UNION AND OVERDRAFT FEES

15.  Defendant is in the business of providing customers with a variety of credit union products and services.  Customers who open a checking account are provided with a debit card, also known as a check card or ATM card.  Through such debit cards, customers can engage in transactions using funds which are withdrawn from their accounts by engaging in "debit" or "point of sale" ("POS") transactions, or may withdraw money from their accounts at ATMs. Whether the card is used to execute POS transactions or to withdraw cash from ATMs, the transaction is processed electronically.  As a result, Defendant is notified instantaneously when the card is swiped, and is able to accept or decline transactions at such time.

16.  In the era of electronic banking and the ubiquitous use of debit cards, the assessment of overdraft fees has become a major profit center for United States financial institutions, including Defendant.  For years, financial institutions covered customers who occasionally bounced checks, and even did so for a time for customers using debit cards, without charging their customers.  Since the early 1990s, however, financial institutions have devised methods to charge fees for each overdraft instance.

17.  Notably, Ideal Credit Union charges $36 for each overdraft fee, no matter the amount of the underlying transaction.

18.  Before debit cards existed, financial institutions occasionally extended the courtesy of honoring paper checks written on overdrawn or otherwise deficient accounts for customers who were typically in good standing.  Financial institutions extended this courtesy largely because the third party involved in a sales transaction allowed the customer to pay by check, expecting the funds to be available and the check to clear.  For example, if a customer wrote a

check to purchase groceries, the grocery store would only know whether the check cleared *after* the groceries had been purchased.

19. The same considerations are not present when customers use debit cards. Financial institutions could simply decline to honor debit or point of sale transactions where accounts lack sufficient funds to execute the transactions. Retail and service transactions could still be executed if consumers presented an alternative form of payment. Automated teller machine ("ATM") transactions could still proceed if the financial institution provided a warning that an overdraft fee would be assessed, and the customer chose to proceed nevertheless. In fact, until the mid-2000's, most financial institutions simply declined debit transactions that would overdraw an account.

20. Instead of simply declining debit transactions when there are insufficient funds, or warning customers that an overdraft fee will be assessed if they proceed with the transaction, Defendant's automated overdraft system routinely processes such transactions and does so without the described notification, and ultimately charges customers an overdraft fee.

21. Defendant's automated overdraft system is intentionally designed to maximize overdraft fee revenue without regard to customers' particular financial circumstances. In marketing its Overdraft Protection Program, Defendant markets the overdraft program by showing a picture of what appears to be a family consisting of a young couple and their daughter at the grocery store, smiling as though they do not have a care in the world and states "We've got you covered when it matters the most." Ideal Credit Union pays overdrafts at their "discretion," which means Ideal Credit Union "do[es] not guarantee that [it] will always authorize and pay any type of transaction." Ideal Credit Union further states, "[i]f we do not authorize and pay an overdraft, your transaction will be declined."

6

22.  Ideal Credit Union's statements regarding "discretion" creates the false impression of a financial institution assessing personal information and making individualized decisions on a case-by-case, transaction-by-transaction basis.

23.  In many instances, these overdraft fees cost Ideal Credit Union account holders hundreds of dollars in a matter of days, or even hours.  Even more egregious, customer accounts may not actually be overdrawn at the time the overdraft fees are charged or at the time of the debit transaction because the person actually has enough money in their account at the time of the transaction, but does not at the time the transaction posts.

24.  Defendant's improperly assessed overdraft fees can actually cause a negative balance in an account that had a positive balance, causing even more overdraft fees to be imposed on subsequent transactions.  In this way, a customer's account can spiral out of control, incurring fee after fee even if there was no initial overdraft to trigger the sequence of events.

25.  Almost by definition, these overdraft fees disproportionately affect the poor, who are most likely to maintain low balances.  Moebs Services, a research company that has conducted studies for the government as well as banks and credit unions, estimates that 90 percent of overdraft fees are paid by the poorest 10 percent of banks' customer base.[1]  Moreover, these fees have the tendency to create a domino effect, because the imposition of a fee on an account with a negative balance will make it less likely that the account holder's balance will reach positive territory, resulting in more fees.

---

[1] http://www.moebs.com/press-releases/ctl/details/mid/380/itemid/193

B.     **DEFENDANT VIOLATES EFTA AND/OR VARIOUS CONSUMER PROTECTION STATUTES**

26.  In response to the rampant abuse of overdraft charges by financial institutions, Regulation E, 12 C.F.R. § 205.17 was implemented to amend the EFTA to include notice requirements for financial institutions concerning overdraft charges.

27.  Under EFTA, financial institutions such as Defendant – as of July 1, 2010, if an account was opened on or after July 1, 2010, or August 15, 2010, if an account was opened prior to July 1, 2010 – may not assess an overdraft fee to a customer for paying an ATM or one-time debit card transaction unless the institution first (i) provides the customer with written notice, separate from all other information, that describes the institution's overdraft program, (ii) provides the customer with an opportunity to opt in such service, (iii) obtains the customer's affirmative consent to the institution's payment of ATM or one-time debit card transactions that would incur an overdraft fee, and (iii) provides written confirmation of the consumer's consent along with a statement *informing the consumer of the right to revoke this consent. See*, 12 C.F.R. § 205.17(b)(1).

28.  For consumers with an account at a financial institution prior to July 1, 2010, the institution *cannot ass*ess any fees on a consumer's account on or after August 15, 2010, for paying an ATM or one-time debit card transaction pursuant to the overdraft service unless the institution has complied with 12 C.F.R. § 205.17(b)(1).  12 C.F.R. § 205.17(c)(1).

29.  For accounts opened on or after July 1, 2010, the financial institution cannot assess any fees on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the overdraft service unless the institution has complied with 12 C.F.R. § 205.17(b)(1).  12 C.F.R. § 205.17(c)(2).

30. The ATM and one-time debit card transactions described herein qualify as an "electronic funds transfer" under EFTA.

31. Defendant qualifies as a financial institution that provides an overdraft service as contemplated by EFTA.

32. Defendant failed to comply with these and other EFTA requirements. *See* 15 U.S.C. §§ 1693b, 1693c; 12 C.F.R. § 205.17. Nonetheless, after the Effective Dates, Defendant, in direct violation of EFTA and to the detriment of Plaintiff and the Class, continued to assess overdraft fees on ATM and one-time debit card transactions.

33. All conditions precedent to the relief sought herein have either occurred or have been performed or waived.

34. The Opt-In Rule prohibits depository institutions from assessing a "fee or charge on a consumer's account for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service" without "obtain[ing] the consumer's affirmative consent, or opt-in, to the institution's payment of ATM or one time debit card transactions[.]" 12 C.F.R. § 1005.17(b)(1).

35. Defendant failed to obtain an affirmative "opt-in" from certain of its customers before charging them overdraft fees (as defined below) in connection with ATM and one-time debit card transactions, in violation of Reg E.

36. Additionally, financial institutions may not condition the payment of any overdrafts for checks, ACH transactions, etc. on whether the consumer opted in to the ATM/debit card overdraft service; however, Defendant leads Plaintiff and the Class Members to believe that it is conditioning the payment of any overdrafts for ACH transactions when it states: "Complete and

submit the form below to authorize Ideal Credit Union to cover your ATM and debit transactions.ö  This is likely to, and does, lead to substantial confusion.

37.  Defendant fails to disclose and/or omits the following material facts regarding the Overdraft Program: (a) if a person **not enrolled** in Overdraft Protection **does not** have enough money in their account **at the point of sale**, the transaction will be declined and the personøs account will not be overdrawn at all; however, (b) if a person **is** enrolled in Overdraft Protection and **does not** have enough money in their account **at the point of sale**, the charge will go through - and the personøs account will be overdrawn when it otherwise would not have been were they not enrolled in Overdraft Protection.  Likewise, a person is more likely to worry about overdrawing their checking account when enrolled in Overdraft Protection as opposed to not being enrolled in Overdraft Protection because (a) if a person **enrolled** into Overdraft Protection **does** have enough money in their account at the point of sale, but, at the time the transaction posts, the person **does not** have enough money in their account, **not only will the person's account be overdrawn in the amount of the transaction, but the Defendant will also be able to (and does) charge the person an Overdraft fee**; however, (b) if a person **not** enrolled into Overdraft Protection has enough money in their account at the point of sale, but, at the time the transaction posts, the person **does not** have enough money, although their account will be overdrawn for the amount of the transaction, an Overdraft Fee **cannot be** charged.  Thus, with Overdraft Protection, a personøs account will also be overdrawn more ó each time an Overdraft occurs that would not have otherwise occurred if the person had not been in Overdraft Protection; but also the Protection.  Overdraft Fee itself is a second example of an amount which overdraws the personøs account that would otherwise not occur if the person was not enrolled in Overdraft

38.  Defendant unfairly, unlawfully, and/or deceptively represented in advertisements and in information provided to consumers that "We've got you covered when it matters the most" and fails to disclose in a meaningful way the cost to opt into Ideal Credit Union's Overdraft Privilege Program.

39.  Under the "Standard overdraft practices that come with your account" heading, Ideal Credit Union further states: "Ideal Credit Union DOES NOT authorize and pay overdrafts for the following types of transactions unless you opt-in to the Overdraft Privilege Program:

•      ATM transactions

•      Everyday debit card transactions"

40.  Ideal Credit Union states "Under our standard overdraft practices, Ideal Credit Union charges you a fee of $36.00 each time an overdraft is paid. There is no limit on the total fees you can be charged for overdrawing your account."  It continues: "There is no charge if Overdraft Protection is never used."

41.  Ideal Credit Union's Opt-In Form does not adhere to the requirements of the Model A-9 Opt-In Form as is required under the EFTA in substance, nor form.  Plaintiff alleges by way of example and not by limitation the following ways in which Defendant's Opt-In Form violates the EFTA and its regulations.

42.  In particular, Ideal Credit Union's Opt-In Form does not use substantially the same language nor substantially the same format as the Model A-9 Form.  Ideal Credit Union does <u>not</u> use the large bold header "What You Need to Know about Overdrafts and Overdraft Fees" across the top of the Opt-In Form.  Instead, Ideal Credit Union uses the following header (which appears to be the largest font on the document) on its Opt-In Form:



43.  Additionally, pictures are worth a thousand words – Ideal Credit Unions uses on its header a picture of what appears to be a family consisting of a young couple and their daughter at the grocery store, smiling as though they do not have a care in the world.

44.  After the large header, a sub-heading provides: "Overdraft Protection Authorization Form." ("Authorization Form" or "Opt In Form.") Then, Ideal Credit Union uses watered down language of "Important Information about Overdrafts and Overdraft Fees."

45.  Ideal Credit Union additionally fails to adhere to Model Form A-9 by failing to underline "overdraft," "standard overdraft practices," and "overdraft protection plans." Defendant further fails to state "To learn more, ask us about these plans."  Additionally, Defendant fails to disclose that "This notice explains our overdraft practices."

46.  Defendant uses the following sub-heading instead of "**What are the <u>standard overdraft practices</u> that come with my account?**": "**Standard overdraft practices that come with your account[.]**"

47.  Defendant also fails to embolden the cost of the overdraft fee; nor does it underline that there is "no limit" on the total fees.

48.  Ideal unfairly, deceptively, fraudulently, and unlawfully directs the consumer to "[c]omplete and submit the form below to authorize Ideal Credit Union to cover your ATM and debit transactions" (as opposed to obtaining authority to "authorize Ideal Credit Union to cover

your ATM and debit transactions **that result in overdraft**ö).  Immediately following the language authorizing Defendant õto cover your ATM and debit transactionsö Ideal Credit Union provides õRequiredö fields for the person to provide their First Name, Last Name[,] Ideal Checking Account Account [Number], and Email Address.  It does not provide a space indicating the date of election.

49.  Only then does the Opt-In form state õPlease confirm your Opt-In preferenceö õ* I would like to opt-in to overdraft privilege.    Yesö; it fails, however, to provide the following language required in the Model A-9 Form:

_____ I do not want [institution name] to authorize and pay

overdrafts on my ATM and everyday debit card transactions.

_____ I want [institution name] to authorize and pay overdrafts

on my ATM and everyday debit card transactions.

50.  Additionally, this language does not appear prior to the consumerøs disclosure of his or her identity and account number.

51.  Defendant charges overdraft fees on one-time debit card transactions and ATM transactions to consumers who had not opted-in for one-time debit card transaction and ATM transaction overdraft coverage.

52.  Furthermore, Defendant markets its overdraft program in a manner that encourages routine or intentional overdrafts.  Defendant does not present the program as a service that covers inadvertent consumer overdrafts.

53.  For example, in Defendantøs Overdraft program advertising and marketing materials, Ideal Credit Union states with respect to Overdraft Protection: õNever worry about overdrawing your checking account again.ö  *See*, https://www.idealcu.com/images/eBrochures/Checking.pdf.

Defendant further states: (1) "Whether it's a bill, a trip to the grocery store or an unexpected expense, Ideal Credit Union wants to make sure you're covered in the event you have insufficient funds in your account[;]$^2$" and (2) "Avoid the embarrassment of a declined transaction with Optional Overdraft Protection [ ].$"^3$

54.  Defendant does not alert consumers before a transaction triggers an overdraft fee.

55.  In fact, Defendant further obscures the problem by failing to provide an accurate accounting of its overdraft fee assessments in customer account statements, which are supposed to be an accurate representation of account activity.  Defendant omits information necessary to: i) identify which transaction is connected to a particular overdraft fee, and ii) reveal its off-ledger "available balance" calculations at the time of each purported overdraft.  Masking this information furthers Defendant's purpose of maximizing overdraft fee income by making it more difficult for customers to understand and challenge improper overdraft fee assessments.

### C.    DEFENDANT'S OVERDRAFT POLICIES AND PRACTICES ARE CONTRARY TO BEST PRACTICES

56.  By engaging in the conduct described herein, Defendant has failed to follow the list of "best practices" for overdraft programs set forth in the "Joint Guidance on Overdraft Protection Programs" ("Joint Guidance") issued by the United States Department of the Treasury, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the National Credit Union Administration (collectively the "Agencies").  A copy of the Joint Guidance is attached as Exhibit D.  These "best practice" recommendations include: "Provide election or opt-out of service.  Obtain affirmative consent of consumers to receive overdraft protection.  Alternatively, where overdraft protection is automatically provided, permit consumers to -opt-out of the

---

[2] https://www.idealcu.com/checking-and-savings/overdraft-protection
[3] https://www.idealcu.com/checking-and-savings/checking-accounts

overdraft program and provide a clear consumer disclosure of this option." 70 F.R. 9127-01, 9132.

57. According to rules proposed by the Agencies: "Injury [caused by overdraft charges] is not outweighed by countervailing benefits . . . . This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee." 73 F.R. 28904-01, 28929 (May 19, 2008).

58. The Joint Guidance also advises banks to "[a]lert customers before a transaction triggers any fees. When consumers attempt to withdraw or transfer funds made available through an overdraft protection program, provide a specific consumer notice, where feasible, that completing the withdrawal may trigger the overdraft fees." 70 F.R. 9127, 9132. The Joint Guidance further advises that "[t]his notice should be presented in a manner that permits consumers to cancel the attempted withdrawal or transfer after receiving the notice." *Id.*

59. Similarly, the list of "best practices" recommended in "Overdraft Protection: A Guide for Bankers," issued by the American Bankers Association, includes offering customers the option of "opting out" of any overdraft programs, and informing customers, before they access funds, that a particular point of sale or ATM transaction will cause them to incur an overdraft fee. A copy of "Overdraft Protection: A Guide for Bankers" is attached as Exhibit E.

60. Defendant's overdraft policies make it difficult for customers to avoid injury even if they carefully track the balance in their account. In fact, the Agencies have stated that injury resulting from such policies, "is not reasonably avoidable" by the consumer. 73 F.R. 28904-01, 28929. "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out. Although

consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account. For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available.ö

61. A chart from the research company Moebs Services shows that, in every year from 1992 to 2009, banks and credit unions gained increased revenues from overdraft fees:



**D.    DEFENDANT'S UNCONSCIONABLE PROVISIONS AND POLICIES**

62. Defendantøs overdraft policies and practices are unconscionable in the following respects, among others:

a.      Prior to the Effective Date, Defendant did not attempt to obtain affirmative consent from checking account customers prior to processing a transaction that would overdraw the account and result in an overdraft fee.

b.      Defendant did not, and does not, alert its customers that a debit card transaction would trigger an overdraft, and did not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee.

c.      Defendant used, and uses, unduly discretionary power to assess fees even at times when no economic argument could be made for such fees.

d.      The Opt-In Form is ambiguous, deceptive, unfair, and misleading to any extent they allowed Defendant to perpetrate the grossly improper acts described herein.

e.      Defendant's marketing and advertisements suggest that in order for Ideal Credit Union to approve a ATM or one time debit card transaction (as opposed to being required for Ideal Credit Union to approve an ATM or one time debit card transaction that would bring one's account into overdraft), one must enroll in the Overdraft Protection Program and such enrollment is not required.

f.      Defendant advertises the Overdraft Protection option so that you "Never worry about overdrawing your checking account again."[4]   In reality, opting into Overdraft Protection actually creates more opportunities "to worry about overdrawing your account" than not opting into Overdraft Protection because: (i) if a person *not enrolled* in Overdraft Protection *does not* have enough money in their account *at the point of sale*, the transaction will be declined and the person's account will not be overdrawn at all; however, (ii) if a person *is* enrolled in Overdraft Protection and *does not* have enough money in their account *at the point of sale*, the charge will go through - and

---

[4] https://www.idealcu.com/images/eBrochures/Checking.pdf

17

the person's account will be overdrawn when it otherwise would not have been were they not enrolled in Overdraft Protection.  Likewise, a person is more likely to worry about overdrawing their checking account when enrolled in Overdraft Protection as opposed to not being enrolled in Overdraft Protection because (i) if a person *enrolled* into Overdraft Protection *does* have enough money in their account at the point of sale, but, at the time the transaction posts, the person *does not* have enough money in their account, *not only will the person's account be overdrawn in the amount of the transaction, but the Defendant will also be able to (and does) charge the person an Overdraft fee*; however, (ii) if a person *not* enrolled into Overdraft Protection has enough money in their account at the point of sale, but, at the time the transaction posts, the person *does not* have enough money, although their account will be overdrawn for the amount of the transaction, an Overdraft Fee *cannot be* charged.  Thus, with Overdraft Protection, a person's account will also be overdrawn more – each time an Overdraft occurs that would not have otherwise occurred if the person had not been in Overdraft Protection; but also the Overdraft Fee itself is a second example of an amount which overdraws the person's account that would otherwise not occur if the person was not enrolled in Overdraft Protection.  For these reasons, worry is increased and Defendant's actions are unconscionable.

g.    Defendant misrepresents the nature of this particular program by referring to it as "Overdraft Protection," which the program does not protect individuals from overdrafts but instead causes people to make more overdrafts and to stay in overdraft status longer.

18

h.      Lastly, Defendant advertises its "Overdraft Protection" by using large bold oversized letters that states "PROTECT YOUR ACCOUNT BALANCE." *See*, https://www.idealcu.com/checking-and-savings/overdraft-protection (Visited: 8/9/2017). In reality, the program does not protect a person's account balance, but instead depletes it at a faster rate.

**E.      DEFENDANT'S OVERDRAFT PRACTICES HARMED PLAINTIFF AND THE MEMBERS OF THE PUTATIVE CLASS**

63.    Defendant's wrongful overdraft policies and practices described and below above harmed Plaintiff and members of the Class.

64.    Plaintiff has been assessed overdrafts in violation of the plain terms of EFTA.

65.    In this lawsuit, Plaintiff challenges those overdraft fees that occurred as a direct result of improper practices of Defendant.

66.    Defendant never notified Plaintiff at the time it executed the purported insufficient funds transactions that their checking account was overdrawn or that they would be charged an overdraft fee as a result of the transactions.  Furthermore, Defendant paid, rather than returned, all of the debit card transactions described above, even though Plaintiff's accounts purportedly lacked sufficient funds to cover the transactions.

67.    Upon information and belief, the overdraft fees assessed upon Plaintiff are representative of millions of dollars of overdraft fees that Defendant wrongfully assessed and deducted from customer accounts.  These wrongful takings are especially egregious considering the fact that Defendant approved each transaction and knew at the time of approval whether there was sufficient funds in the account to cover the transaction in question and whether Defendant had adhered to each requirement of EFTA for that particular consumer.

## F.      THE DAMAGES SUSTAINED BY PLAINTIFF AND THE CLASS

68.    As a consequence of Defendant's overdraft policies and practices, Plaintiff and the members of the putative Class have been wrongfully forced to pay overdraft fees. Defendant has improperly deprived Plaintiff and the members of the Class of significant funds, causing ascertainable monetary losses and damages.

69.    As a consequence of Defendant's improper practices, policies, and overdraft fees, Plaintiff and the members of the putative Class have been wrongfully deprived of funds to which Defendant had no legitimate claim.

## CLASS ALLEGATIONS

70.    Plaintiff brings this action on behalf of Plaintiff's self and all others similarly situated pursuant to Rule 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure.

71.    This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

72.    Plaintiff proposes the following class, defined as:

> All customers of Defendant who were assessed an overdraft fee for an ATM or one-time debit card transaction after (a) July 1, 2010, if the account was opened on or after July 1, 2010; or (b) August 15, 2010, if the account was opened prior to July 1, 2010.

73.    Plaintiff reserves the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate and as the Court may otherwise allow. Excluded from the Class are:

> a.      Defendant and any entities in which Defendant has a controlling interest;

> b.      Any entities in which Defendant's officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of Defendant;

c.      The Judge(s) to whom this case or any transferred case is assigned and any member of the Judges' immediate family and any other judicial officer assigned to this case or any transferred case;

d.      Any attorneys representing Plaintiff or the Class; and

e.      All governmental entities.

74.   **Numerosity – Fed. R. Civ. P. 23(a)(1)**.  The members of the Class are so numerous that joinder of all members would be impracticable.  The Class consists of thousands of members and the identity of those persons is within the knowledge of, and can be ascertained by resorting to, Defendant's records.

75.   **Commonality – Fed. R. Civ. P. 23(a)(2) and (b)(3)**.  There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members.

76.   Among the questions of law and fact common to the to the Class are whether:

a.      Defendant provided customers with a notice describing its overdraft services that complied with 12 C.F.R. §§ 205.17(b)(1)(i), (d);

b.      Defendant provided customers with a reasonable opportunity to affirmatively consent, or opt-in, to overdraft services in accordance with 12 C.F.R. § 205.17(b)(1)(ii);

c.      Defendant obtained customers' affirmative consent, or opt-in, to overdraft services in accordance with 12 C.F.R. § 205.17(b)(1(iii);

d.      Defendant provided customers with confirmation of their consent in accordance with 12 C.F.R. § 205.17(b)(1)(iv);

e.      Defendant assessed Overdraft Fees in Violation Of EFTA.

f.      Defendant violated the Minnesota False Statement in Advertisement Act, Minn. Stat. § 325F.67;

g.      Defendant violated Minnesota Consumer Fraud Act, Minn. Stat. 325F.69, Subd. 1;

h.    Defendant violated the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. 325D.44, Subd. 1(5)(9) and (13), *et seq.*;

i.    Plaintiff and the respective class members are entitled to an injunction prohibiting Defendant from engaging in the unfair, unlawful, unconscionable, and/or deceptive business practices as described herein

j.    Whether Plaintiff and the respective class members are entitled to attorneys' fees; and/or

k.    Whether Plaintiff and the respective class members are entitled to costs.

77.    **Typicality – Fed. R. Civ. P. 23(a)(3)**.  Plaintiff asserts claims that are typical of the Class Plaintiff purports to represent, having all been targeted by Defendant as consumers who were improperly assessed one or more overdraft charges and overdraft fees whether by failing to notify consumers that approving a debit would result in an overdraft charge or failing to comply with the Electronic Funds Transfer Act.  Plaintiff and the Class members have similarly suffered harm arising from Defendant's violations of one or more statutory or common laws as alleged in this Complaint.

78.    **Adequacy of Representation – Fed. R. Civ. P. 23(a)(4), 23(g)(1)**.  Plaintiff is an adequate representative of the Class because Plaintiff fits within the class definitions and Plaintiff's interests do not conflict with the interests of the members of the Class Plaintiff seeks to represent.  Plaintiff is passionate about this litigation personally and will prosecute this action vigorously for the benefit of the entire Class.  Plaintiff is represented by experienced and able attorneys from coordinated law firms that will collectively and jointly serve as class counsel.  Class counsel has litigated numerous class actions, and Plaintiff's counsel intends to prosecute this action vigorously for the benefit of the entire Class.  Plaintiff and class counsel can fairly and adequately protect the interests of all of the Members of the Class.

79.  **Superiority of Class Action – Fed. R. Civ. P. 23(b)(3)**.  The class action is the best available method for the efficient adjudication of this litigation because individual litigation of Class membersø claims would be impracticable and individual litigation would be unduly burdensome to the courts.  Plaintiff and members of the Class have suffered irreparable harm as a result of Defendantøs fraudulent, deceitful, unlawful, and unfair conduct.  Because of the size of the individual Class membersøclaims, no Class members could afford to seek legal redress for the wrongs identified in this Complaint.  Without the class action vehicle, the Class members would have no reasonable remedy and would continue to suffer losses, as Defendant continues to engage in the unlawful, unfair, deceptive, and/or unconscionable conduct that is the subject of this Complaint, and Defendant would be permitted to retain the proceeds from their continued violations of law.  Further, individual litigation has the potential to result in inconsistent or contradictory judgments.  A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  There will be no difficulty in the management of this action as a class action.

80.  **Injunctive and Declaratory Relief – Fed. R. Civ. P. 23(b)(2)**.  Defendantøs wrongful acts, omissions, practices, and/or policies are uniform as to all members of the Class.  Defendant has refused to act on grounds that apply generally to the Class, so that final injunctive relief or declaratory relief is appropriate with respect to the Class as a whole.

81.  **Certification of Particular Issues.  Fed. R. Civ. P. 23(c)(4).**  Issue certification is also appropriate because the following particular issues (among others) exist that may be brought or maintained as a class action:

a.      Whether Defendantøs policies and/or practices as described herein are unconscionable, unfair, deceptive, fraudulent, unethical, and/or deceptive;

b.    Whether Defendant provided customers with a notice describing its overdraft services that complied with 12 C.F.R. §§ 205.17(b)(1)(i), (d);

c.    Whether Defendant provided customers with a reasonable opportunity to affirmatively consent, or opt-in, to overdraft services in accordance with 12 C.F.R. § 205.17(b)(1)(ii);

d.    Whether Defendant obtained customersø affirmative consent, or opt-in, to overdraft services in accordance with 12 C.F.R. § 205.17(b)(1(iii);

e.    Whether Defendant provided customers with confirmation of their consent in accordance with 12 C.F.R. § 205.17(b)(1)(iv);

f.    Whether Defendant assessed Overdraft Fees in Violation of EFTA;

g.    Whether Defendant violated the Minnesota False Statement in Advertisement Act, Minn. Stat. § 325F.67;

h.    Whether Defendant violated Minnesota Consumer Fraud Act, Minn. Stat. 325F.69, Subd. 1;

i.    Whether Defendant violated the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. 325D.44, Subd. 1(5)(9) and (13), *et seq.*; and/or

j.    Whether Defendantøs made misrepresentations and/or omissions that were material.

## COUNT I
## VIOLATION OF THE ELECTRONIC FUNDS TRANSFER ACT AND REGULATIONS SUCH AS 15 U.S.C. § 1693 AND 12 C.F.C. § 205

82.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in each paragraph of this Complaint as if fully set forth herein.

83.    Plaintiff alleges this claim individually and on behalf of the Class members who have been assessed one or more overdraft fees or charges based on ATM or debit card transactions.

84.    Plaintiff, individually and on behalf of the Class, assert that Defendant failed to:

a.    provide customers with a notice describing its overdraft services that complies with 12 C.F.R. §§ 205.17(b)(1)(i), (d);

24

b.      provide customers with a reasonable opportunity to affirmatively consent, or opt in, to overdraft services in accordance with 12 C.F.R. § 205.17(b)(1)(ii);

c.      obtain customersø affirmative consent, or opt-in, to overdraft services in accordance with 12 C.F.R. § 205.17(b)(1)(iii); and/or

d.      provide customers with confirmation of their consent in accordance with 12 C.F.R. § 205.17(b)(1)(iv).

85.   Nonetheless, Defendant imposed overdraft fees on them based on ATM or one time debit card transactions that overdrew the account, in violation of 12 C.F.R. §§ 205.17(b), (c).

86.   As a result of Defendantøs violations of EFTA, pursuant to 15 U.S. Code § 1693m, Defendant is liable to Plaintiff and the EFTA Class for actual and statutory damages and Plaintiff and the Class are entitled to recover costs of suit and their reasonable attorneysø fees.

## COUNT II
## MINNESOTA CONSUMER FRAUD ACT,
### Minn. Stat. 325F.69, subd. 1

87.   Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in each paragraph of this Complaint as if fully set forth herein.

88.   Plaintiff brings these claims individually and on behalf of the Class.

89.   Minnesota law protects consumers.  The Minnesota Prevention of Consumer Fraud Act (õMPCFAö) makes unlawful, õ[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby.ö Minn. Stat. § 325F.69, subd. 1.

90.     The Minnesota Private Attorney General statute further provides that "any person injured by a violation of [the MPCFA] may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court." Minn. Stat. § 8.31, subd 3a.

91.     Plaintiff, members of the Class, and Defendant are "Persons" as defined by the Minnesota Prevention of Consumer Fraud Act ("MPCFA"), Minn. Stat. § 325F.68, subd 3.

92.     The Overdraft Program sold by Defendant to Plaintiff and the Class are "Merchandise" as defined by Minn. Stat. § 325F.68, subd 2.

93.     The Defendant misrepresented and/or omitted material facts regarding the nature of the Overdraft Program.

94.     These misrepresentations, misleading statements, deceptive practices, fraud, false pretenses, and/or false promises were made with the intent that Plaintiff and the Class rely thereon in connection with the sale of the Overdraft Program.

95.     By concealing and omitting material information from Plaintiff and the Class members and by making affirmative misrepresentations as described above, the Defendant engaged in deceptive business practices prohibited by the MPCFA. The Defendant's material omissions and misrepresentations were made with the intent that Plaintiff and the Class members would rely upon them, and Plaintiff and the Class members did in fact rely upon those material omissions and misstatements.

96.     Specifically, among other things more fully described in this Complaint, Defendant violated the MPCFA by omitting the following material facts that if Plaintiff does not join the Overdraft Protection program, (a) when a Plaintiff does not have enough money his account at the point of sale, Plaintiff will avoid an overdraft fee because the debit card

26

transaction will not go through and therefore there would have been no overdraft (and if it had somehow gone through, Defendant would not be permitted to charge an overdraft fee); and (b) if Plaintiff does have enough money in his account at the time of sale, but does not at the time the transaction actually posts, Plaintiff cannot be charged an overdraft fee because Defendant is not allowed to by law.

97.    Defendant also misrepresented the Overdraft Program by using the following language to describe a benefit of enrolling in the Overdraft Program: "Never worry about overdrawing your checking account again." In reality, opting into Overdraft Protection actually creates more opportunities "to worry about overdrawing your account" than not opting into Overdraft Protection because: (a) if a person *not enrolled* in Overdraft Protection *does not* have enough money in their account *at the point of sale*, the transaction will be declined and the person's account will not be overdrawn at all; however, (b) if a person *is* enrolled in Overdraft Protection and *does not* have enough money in their account *at the point of sale*, the charge will go through – and the person's account will be overdrawn when it otherwise would not have been were they not enrolled in Overdraft Protection. Likewise, a person is more likely to worry about overdrawing their checking account when enrolled in Overdraft Protection as opposed to not being enrolled in Overdraft Protection because (a) if a person *enrolled* into Overdraft Protection *does* have enough money in their account at the point of sale, but, at the time the transaction posts, the person *does not* have enough money in their account, *not only will the person's account be overdrawn in the amount of the transaction, but the Defendant will also charge the person an Overdraft fee*; however, (b) if a person *not* enrolled into Overdraft Protection has enough money in their account at the point of sale, but, at the time the transaction posts, the person *does not* have enough money, although their account will be overdrawn for the amount of

the transaction, an Overdraft Fee *cannot be* charged. Thus, with Overdraft Protection, a person's account will also be overdrawn more – each time an Overdraft occurs that would not have otherwise occurred if the person had not been in Overdraft Protection; but also, the Overdraft Fee itself is a second example of an amount which overdraws the person's account that would otherwise not occur if the person was not enrolled in Overdraft Protection. For these reasons, Overdraft Protection increases worry about overdrawing one's account and definitely does not decrease worry about overdrawing one's account.

98. Defendant also misrepresents the nature of the Overdraft program by referring to it as "Overdraft Protection," because the program does not protect individuals from overdrafts but instead causes them to overdraft and stay in overdraft status longer.

99. Lastly, Defendant advertises its "Overdraft Protection" by using large bold oversized letters that states "PROTECT YOUR ACCOUNT BALANCE." *See*, https://www.idealcu.com/checking-and-savings/overdraft-protection (Visited: August 9, 2017). In reality, the program does not protect a person's account balance, but instead depletes it at a faster rate.

100. Additionally, Defendant's policies and practices described in this Complaint violates Regulation E, 12 C.F.R. § 205.17, and the implementing regulation of the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693, *et seq*. By violating Regulation E, 12 C.F.R. § 205.17, and the implementing regulation of the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693, *et seq*., Defendant has violated the MPCFA.

101. The Defendant's unfair and/or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff.

28

102.    Plaintiff and the Class members sustained damages as a result of the Defendant's unlawful acts and are, therefore, entitled to damages and other relief as provided under the MPCFA.

103.    The enforcement of this action provides a substantial public benefit in that it will halt the false, unfair, deceptive, and/or misleading practices of Defendant towards Plaintiff and members of the Class.

**COUNT III**
**VIOLATION OF THE MINNESOTA UNIFORM**
**DECEPTIVE TRADE PRACTICES ACT,**
**Minn. Stat. 325D.44, subd. 1(5)(9) and (13), *et seq.***

104.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in each paragraph of this Complaint as if fully set forth herein.

105.    Plaintiff brings this claim individually and on behalf of the Class members.

106.    Defendant is a "person" within the meaning of The Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. 325D.44 ("MUDTPA.")

107.    The Minnesota Deceptive Trade Practices Act ("MDTPA") provides, in pertinent part, that "[a] person engages in a deceptive trade practice when, in the course of business, vocation, or occupation the person: . . .: (5) represents that services have benefits, that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have; (9) advertises services with intent not to sell them as advertised; (13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.  Minn. Stat. § 325D.44, Subds. 1 (5), (9), (13).

108.    In the course of its business, vocation or occupation, Defendant has violated these sections of the MDTPA.

109.    First, Defendant tells Plaintiff and the Class to õComplete and submit the form below to authorize Ideal Credit Union to cover your ATM and debit transactions[;]ö  However, oneøs ATM  and debit card transactions are covered as long as one has a debit card and an account with sufficient money in it at the time of sale or at the time of the ATM transaction.  In fact, enrollment in Overdraft program does not õauthorize Ideal Credit Union to cover your ATM and debit transactions,ö it authorizes Defendant to cover your ATM and debit transactions *that would cause the account to go into overdraft*.ö  *See*, https://www.idealcu.com/member-benefits/overdraft-privilege-odp.  It also authorizes Defendant to charge a $36.00 Overdraft fee at any point that the account is negative at the time of sale or at the time that the transaction posts.

110.    Second, Defendant misrepresents that Overdraft Protection program has characteristics, uses, or benefits that it does not have ó namely, that the Overdraft Protection plan is to õauthorize Ideal Credit Union to cover your ATM and debit transactionsö when it really is to authorize Ideal Credit Union to cover ATM and debit card transactions that would cause an overdraft and to charge an overdraft fee on that transaction.

111.    Third, Defendant advertises services with intent not to sell them as advertised in that Defendantøs customers do not need the Overdraft Program for Ideal Credit Union to cover oneøs ATM and debit transactions ó one just needs a debit card with enough money in the account at the point of sale.  And the only reason Defendant wants to sign the person up for the Overdraft Protection Program is to have permission to charge an overdraft fee in the event the account is overdrawn by an ATM or Non-recurring debit card transaction.

112.    Lastly, Defendant creates a likelihood of confusion or of misunderstanding by not fully explaining the nature of the Overdraft Program.  Defendant asserts, represents, and/or states

30

that, by enrolling in the Overdraft program, one will "Never worry about overdrawing your checking account again." In reality, opting into Overdraft Protection actually creates more opportunities "to worry about overdrawing your account" than not opting into Overdraft Protection because: (a) if a person *not enrolled* in Overdraft Protection *does not* have enough money in their account *at the point of sale*, the transaction will be declined and the person's account will not be overdrawn at all; however, (b) if a person *is* enrolled in Overdraft Protection and *does not* have enough money in their account *at the point of sale*, the charge will go through – and the person's account will be overdrawn when it otherwise would not have been were they not enrolled in Overdraft Protection.   Likewise, a person is more likely to worry about overdrawing their checking account when enrolled in Overdraft Protection as opposed to not being enrolled in Overdraft Protection because (a) if a person *enrolled* into Overdraft Protection *does* have enough money in their account at the point of sale, but, at the time the transaction posts, the person *does not* have enough money in their account, *not only will the person's account be overdrawn in the amount of the transaction, but the Defendant will also charge the person an Overdraft fee*; however, (b) if a person *not* enrolled into Overdraft Protection has enough money in their account at the point of sale, but, at the time the transaction posts, the person *does not* have enough money, although their account will be overdrawn for the amount of the transaction, an Overdraft Fee *cannot be* charged.  Thus, with Overdraft Protection, a person's account will also be overdrawn more – each time an Overdraft occurs that would not have otherwise occurred if the person had not been in Overdraft Protection; but also, the Overdraft Fee itself is a second example of an amount which overdraws the person's account that would otherwise not occur if the person was not enrolled in Overdraft Protection. For these reasons, Overdraft Protection increases worry about overdrawing one's account and definitely does not

decrease worry about overdrawing one's account.  For these reasons, Defendant's assertion, statement, and/or advertisement are likely to create confusion and/or misunderstanding.

113.   By engaging in the conduct alleged herein, Defendant violated and continues to violate the MUDTPA.

114.   At all relevant times, Defendant's conduct as described above constitutes multiple, separate violations of MUDTPA.

115.   As a result of Defendant's practices as alleged, Plaintiff and members of the Class have suffered actual damages because they would not have enrolled in Overdraft Protection.

116.   Because Plaintiff is likely to be damaged by the aforementioned deceptive trade practices of Defendant, injunctive relief is appropriate.

117.   Upon information and belief, Defendant has willfully engaged in the aforementioned deceptive trade practices knowing it to be deceptive, making an award of attorney fees and costs to Plaintiff appropriate.

**COUNT IV**
**VIOLATION OF THE MINNESOTA FALSE**
**STATEMENT IN ADVERTISEMENT ACT,**
**MINN. STAT § 325F.67**

118.   Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in each paragraph of this Complaint as if fully set forth herein.

119.   Plaintiff brings this claim individually and on behalf of the Class members.

120.   Minnesota law protects consumers from false advertising.  The Minnesota False Statement in Advertisement Act, Minn. Stat. § 325F.67 (2014), provides as follows:

> Any person, firm, corporation, or association who, with intent to sell or in anywise dispose of merchandise, securities, service, or anything offered by such person, firm, corporation, or association, directly or indirectly, to the public, for sale or distribution, or with intent to increase the consumption thereof, or

to induce the public in any manner to enter into any obligation relating thereto, or to acquire title thereto, or any interest therein, makes, publishes, disseminates, circulates, or places before the public, or causes, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in this state, in a newspaper or other publication, or in the form of a book, notice, handbill, poster, bill, label, price tag, circular, pamphlet, program, or letter, or over any radio or television station, or in any other way, an advertisement of any sort regarding merchandise, securities, service, or anything so offered to the public, for use, consumption, purchase, or sale, which advertisement contains any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading, shall, whether or not pecuniary or other specific damage to any person occurs as a direct result thereof, be guilty of a misdemeanor, and any such act is declared to be a public nuisance and may be enjoined as such.

121.    Furthermore, Minnesota law provides that "any person injured by a violation of any of the laws referred to in subdivision 1 [which includes Minn. Stat. § 325F.67] may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court." Minn. Stat. § 8.31, subd. 3a.

122.    Defendant's Overdraft Protection product is "merchandise" or "service" or "anything offered" within the meaning of Minn. Stat. § 325F.67, and their advertisements[5] and Overdraft Protection Authorization Form[6] are advertising within the meaning of Minn. Stat. § 325F.67.  Defendant's offered Overdraft Protection for sale in Minnesota to Plaintiff and the Class members.   The advertisements and Authorization Forms are intended to encourage Plaintiff and the Class members to enroll in Overdraft Protection (i.e., to increase consumption), and are material assertions, representations, and/or statements of fact that were made and

---

[5]  For example, https://www.idealcu.com/member-benefits/overdraft-privilege-odp
[6]  For example, the one available at :
https://campaign.documatix.com/DM/DPS/WebForms/Webform/0E6FF460EC6AC51E

disseminated by Defendant to increase the consumption thereof, or to induce Plaintiff and the Class Members in any manner to enter into any obligation relating thereto.

123.    Defendant's advertisements and/or Authorization Form contain one or more material assertions, representations, or statement of facts which are untrue, deceptive, and/or misleading for the reasons set forth in this Complaint.

124.    On Defendant's Authorization Form, Defendant states "Complete and submit the form below to authorize Ideal Credit Union to cover your ATM and debit transactions." However, one's ATM  and debit card transactions are covered as long as one has a debit card and an account with sufficient money in it at the time of sale or at the time of the ATM transaction. In fact, enrollment in Overdraft program does not "authorize Ideal Credit Union to cover your ATM and debit transactions," it authorizes Defendant to cover your ATM and debit transactions *that would cause the account to go into overdraft*." *See*, https://www.idealcu.com/member-benefits/overdraft-privilege-odp.  It also authorizes Defendant to charge a $36.00 Overdraft fee at any point that the account is negative at the time of sale or at the time that the transaction posts.  Defendant on its marketing and/or authorization form has, therefore, made an untrue, deceptive, and/or misleading statement.

125.    Defendant asserts, represents, and/or states that its Overdraft program as "Overdraft Protection."  Defendant's statement is untrue, deceptive, and/or misleading because, the program does not protect individuals from overdrafts, but instead creates more overdrafts because (1) the bank will authorize a transaction when there is not enough money in the account at the at the point of sale (or at the ATM) instead of declining the transaction; and (2) the bank will charge an overdraft fee of $36.00 for each such transaction, thereby causing a second

overdraft to the account..   For these reasons, Defendant's assertion, statement, and/or advertisement is untrue, deceptive, and/or misleading in violation of the Act.

126.    Lastly, Defendant asserts, represents, and/or states that its "Overdraft Protection" by using large bold oversized letters that states "PROTECT YOUR ACCOUNT BALANCE." *See*, https://www.idealcu.com/checking-and-savings/overdraft-protection (Visited: 8/9/2017).  In reality, the program does not protect a person's account balance, but instead depletes one's account balance at a faster rate because (1) the bank will authorize a transaction when there is not enough money in the account at the at the point of sale (or at the ATM) instead of declining the transaction; and (2) the bank will charge an overdraft fee of $36.00 for each such transaction, thereby causing a second overdraft to the account.  For these reasons, Defendant's assertion, statement, and/or advertisement is untrue, deceptive, and/or misleading in violation of the Act.

127.    Lastly, Defendant asserts, represents, and/or states that, by enrolling in the Overdraft program, one will "Never worry about overdrawing your checking account again."  In reality, opting into Overdraft Protection actually creates more opportunities "to worry about overdrawing your account" than not opting into Overdraft Protection because: (a) if a person ***not enrolled*** in Overdraft Protection ***does not*** have enough money in their account ***at the point of sale***, the transaction will be declined and the person's account will not be overdrawn at all; however, (b) if a person ***is*** enrolled in Overdraft Protection and ***does not*** have enough money in their account ***at the point of sale***, the charge will go through - and the person's account will be overdrawn when it otherwise would not be were they not enrolled in Overdraft Protection. Likewise, a person is more likely to worry about overdrawing their checking account when enrolled in Overdraft Protection as opposed to not being enrolled in Overdraft Protection because (a) if a person ***enrolled*** into Overdraft Protection ***does*** have enough money in their account at the

point of sale, but, at the time the transaction posts, the person ***does not*** have enough money in their account, ***not only will the person's account be overdrawn in the amount of the transaction, but the Defendant will also charge the person an Overdraft fee***; however, (b) if a person ***not*** enrolled into Overdraft Protection has enough money in their account at the point of sale, but, at the time the transaction posts, the person ***does not*** have enough money, although their account will be overdrawn for the amount of the transaction, an Overdraft Fee ***cannot be*** charged. Thus, with Overdraft Protection, a person's account will also be overdrawn more – each time an Overdraft occurs that would not have otherwise occurred if the person had not been in Overdraft Protection; but also, the Overdraft Fee itself is a second example of an amount which overdraws the person's account that would otherwise not occur if the person was not enrolled in Overdraft Protection. For these reasons, Overdraft Protection increases worry about overdrawing one's account and definitely does not decrease worry about overdrawing one's account. For these reasons, Defendant's assertion, statement, and/or advertisement is untrue, deceptive, and/or misleading in violation of the Act.

128.    These material assertions, representations, and/or statements of fact are untrue, deceptive, or misleading and each constitute a violation of the Minnesota False Statement in Advertisement Act.

129.    Defendant had and has a duty to truthfully and accurately disclose the actual nature of the Overdraft Protection program.

130.    Defendant's failure to disclose the material facts as set forth more fully in this Complaint, in light of the deceptive, misleading and untrue statements on advertisements and authorization form, is a violation of the Minnesota False Statement in Advertisement Act.

131.    Defendant intended to sell their Overdraft Protection and increase consumption of Overdraft Protection, or to induce the Plaintiff and the Class in any manner to enter into any obligation relating to Overdraft Protection.

132.    Defendant induced Plaintiff and the Class members for use, consumption, purchase, or sale the Overdraft Protection program at issue based on statements contained on the advertisements and Authorization Form.

133.    Defendant's misrepresentations and omissions have the capacity and ability to members were misled and deceived by Defendant's material misrepresentations and/or omissions and were damaged and injured as a result of Defendant's conduct because if they had deceive consumers.

134.    A reasonable consumer would have been deceived and misled by Defendant's misrepresentations and omissions.

135.    Plaintiff and the Class known the advertisements and authorization form did not truthfully describe the nature of the Overdraft Protection program, they would not have enrolled in Overdraft Protection.

136.    The enforcement of this action provides a substantial public benefit in that it will halt the false, deceptive, and misleading practices of Defendant's towards Plaintiff and members of the Class.

## COUNT V
## NEGLIGENT MISREPRESENTATION

137.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in each paragraph of this Complaint as if fully set forth herein.

138.    Plaintiff brings this claim individually and on behalf of the Class.

139.    Defendant made representations to Plaintiff and members of the Class concerning their Overdraft Program that were not true for the reasons stated herein and Count IV.

140.    The representations were made on Defendant's advertisements, marketing materials, and/or Defendant's Overdraft Protection Authorization Form.

141.    Defendant owed a duty of care to Plaintiff and members of the Class to provide the program to purchasers as it was marketed and advertised by Defendant.

142.    Defendant had no reasonable grounds for believing the representations that they made regarding the nature of their Overdraft program were true when they made them, and did not exercise reasonable care to ensure that the program marketed and sold was what Defendant represented them to be.

143.    Plaintiff and members of the Class justifiably relied upon Defendant's misrepresentations.

144.    These actions by Defendant caused damage to Plaintiff and members of the Class.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, requests a judgment as follows:

A.      A declaration that Defendant's overdraft fee policies and practices violate the EFTA and other statutory and common law as described herein;

B.      An award of restitution of all overdraft fees at issue paid to Defendant by Plaintiff and the Class as a result of the wrongs alleged herein amount to be determined at trial;

C.      Disgorgement of the ill-gotten gains derived by Defendant from its misconduct;

D.      An award of actual damages in an amount according to proof;

E.      An award of statutory damages;

F.      An award of punitive and exemplary damages;

G.      An award of pre-judgment interest at the maximum rate permitted by applicable law;

H.      An award of Attorneys' fees, costs, and expenses pursuant to applicable law; and

I.      An award of such other relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted by,

DATED this _29th _ day of August, 2017.

/s/ Genevieve Zimmerman
Genevieve M. Zimmerman (MN # 330292)
MESHBESHER & SPENCE LTD.
1616 Park Avenue South
Minneapolis, MN 55404
Phone: (612) 339-9121
Facsimile: (612) 339-9188
gzimmerman@meshbesher.com

Jasper D. Ward IV (*Pro Hac Vice* forthcoming)
JONES WARD PLC
The Pointe
1205 E. Washington St., Suite 111
Louisville, Kentucky 40206
Phone: (502) 882-6000
Facsimile: (502) 587-2007
jasper@jonesward.com

Francis J. "Casey" Flynn (*Pro Hac Vice* forthcoming)
Law Office of Francis J. Flynn, Jr.
6220 West Third Street, #115
Los Angeles, CA 90036
Phone: (323) 424-4194
francisflynn@gmail.com

*Attorneys for Plaintiff*

39